STANACARD, LLC, Plaintiff,

v.

REBTEL NETWORKS, AB, and Rebtel Mobile, Inc., Defendants.

No. 08 Civ. 4859.

United States District Court, S.D. New York.

Jan. 6, 2010.

Winston & Strawn LLP, by Scott R. Samay, Esq., Jason S. Charkow, Esq., New York, NY, by Peter C. McCabe III, Esq., W. Gordon Dobie, Esq., Chicago, IL, for Plaintiff.

Ropes & Gray LLP, by Jesse J. Jenner, Esq., Ching–Lee Fukuda, Esq., Todd M. Simpson, Esq., New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

Plaintiff Stanacard, LLC ("Plaintiff" or "Stanacard") brings this action against defendants Rebtel Networks, AB and Rebtel Mobile, Inc. (collectively, "Defendants" or "Rebtel") alleging infringement of 17 claims of U.S. Patent No. 7,346,156 ("the '156 Patent"): claims 1–4, 6–8, 12, 14, 15, 18, 20–22, 25, 30, and 35 (collectively, the "claims-in-suit").

Pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), the parties have submitted briefing regarding their proposed construction of disputed terms contained within the '156 Patent. Rebtel has also moved for summary judgment on the grounds that the asserted claims of the '156 Patent are invalid for indefiniteness.

Upon the facts and conclusions set forth below, the Rebtel's motion for summary judgment is denied. The Court's construction of the disputed terms is set forth below.

## I. PRIOR PROCEEDINGS

On May 23, 2008, Stanacard filed its complaint alleging infringement of the '156 Patent.

On August 15, 2008, Rebtel filed its answer and counterclaims, denying infringement and seeking a declaratory judgment of noninfringement and invalidity of the '156 Patent for failure to satisfy the requirements of 35 U.S.C. §§ 102, 103, and/or 112.

On June 4, 2009, the Court held a *Markman* hearing to address issues of construction of certain claim terms of the '156 Patent.

Defendants' motion for summary judgment was marked fully submitted on September 2, 2009.

## II. THE FACTS

The facts as set forth below are taken from Rebtel's Statement of Material Facts in Support of Its Motion for Summary Judgment of Invalidity of the '156 Patent Due to Indefiniteness and Stanacard's Reply to Rebtel's Statement of Material Facts.

The '156 Patent is entitled "Methods and Apparatuses for Placing a Telephone Call" and involves technology designed to simplify and reduce the cost of making long distance and international calls. Calling cards have traditionally been utilized to allow callers to place telephone calls at a lower rate than calls placed using traditional telephone companies. However, using calling cards requires dialing several numbers, including a toll free number, a pin number, and the number of the party the caller is trying to reach.

The '156 Patent describes a system of making reduced-cost long distance or international calls while only requiring a caller to remember and dial a single local telephone number. This local telephone number, along with the telephone number from which a call is made, is associated with a recipient's telephone number. As a result, a caller dialing the local telephone number is connected to the recipient as if the caller had dialed the recipient's actual telephone number. For instance, a caller in New York City could be provided or select the telephone number (212) 555–2222 to call his mother in England, the recipient at 011 44 1 11 11 11 11. When the caller dials (212) 555–2222, the caller is connected to his mother in England.

In order to make such a design economically feasible, the system is designed so that callers share the local telephone numbers provided to place their calls. As a result, many different users use the same dial-in number (such as (212) 555–2222) to reach their respective recipients. The system is able to connect each caller to the correct recipient because the recipient's number is selected based on both the telephone number from which the call is being made and the dialed telephone number.

## III. THE LEGAL FRAMEWORK

### A. *Claim Construction*

■ "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (citation omitted). The language of the patent claim circumscribes the metes and bounds of the patent owner's property right by defining the bounds of the claim scope. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir.2002). "It is the responsibility of patent applicants to disclose their inventions adequately." *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed.Cir. 1993) (citing 35 U.S.C. § 112). "A patent applicant cannot disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent." *Id.*

■ Courts are charged with interpreting disputed claim terms of a patent as a matter of law. *Markman*, 517 U.S. at 384–85, 116 S.Ct. 1384. However, "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims," *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed.Cir.2008), and district courts routinely decline to interpret claim terms where the terms sought to be defined by a party are readily understood. *See, e.g., Advanced Software Design Corp. v. Fiserv, Inc.*, 625 F.Supp.2d 815, 826 (E.D.Mo.2008) (finding terms "print" or

"printing" and "match" to have their plan and ordinary meaning as understood by someone in the art at the time of the invention); *Level 3 Commc'n, LLC v. Limelight Networks, Inc.*, 589 F.Supp.2d 664, 686–88 (E.D.Va.2008) (refusing to adopt definitions for the terms "obtain[ing]," "determine" and related phrases because they each had a plain and ordinary meaning); *Parker–Hannifin Corp. v. Baldwin Filters, Inc.*, No. 1:07–cv–1709, 2008 WL 5732941, at *10, 2008 U.S. Dist. LEXIS 108152, at *38 (N.D.Ohio July 3, 2008) (finding the words "surrounding and defining" required no construction and should be given their plain and ordinary meaning); *Caddy Prods. Inc. v. Am. Seating Co.*, Civil No. 05–800 (JRT/FLN), 2008 WL 927569, at *9, 2008 U.S. Dist. LEXIS 29130, at *24 (D.Minn. Apr. 4, 2008) (finding ordinary meaning of terms "engaging" and "enclosing" required no definition); *WIMCO, LLC v. Lange Indus., Inc.*, No. 06–CV–3565 (PJS/RLE), 2007 WL 4461629, at *4, 2007 U.S. Dist. LEXIS 92502, at *10–11 (D.Minn. Dec. 14, 2007) (refusing to construe term "filtered drain from the erosion control basin," because "[t]he words in this term are ordinary words, used in their ordinary sense, and any further definition or paraphrasing would serve no useful purpose").

 In interpreting the meaning of claim terms, "words of a claim 'are generally given their ordinary and customary meaning'" to a person of ordinary skill in the art at the time of invention (i.e., the effective filing date of the patent application). *Phillips*, 415 F.3d at 1312–13 (citations omitted). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Thus, the Federal Circuit has

emphasized the importance of "intrinsic" evidence in claim construction: the words of the claim themselves, the written description in the patent's specification, and, when necessary, the history of the patent application's prosecution before the U.S. Patent and Trademark Office. *Id.* at 1314–17.

The process of claim construction begins with the language of the claims themselves. The language of the claim is what the patentee chose to use to "'particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention.'" *Id.* at 1311–12 (quoting 35 U.S.C. § 112, ¶ 2). Thus, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. In addition to the particular claim being examined, the context provided by other claims may be helpful as well. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314–15.

 Claim language must also be read in the context of the specification. *Id.* at 1315. As the Federal Circuit has made clear, "claims, of course, do not stand alone. Rather, they are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed.Cir.1995)). "For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman*, 52 F.3d at 979). The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)). Moreover, when the pat-

entee " 'act[s] as his or her own lexicographer' " and includes an explicit definition of a claim term in the specification, that definition is dispositive over any ordinary meaning. *Id.* at 1319 (citation omitted); *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir. 1998) ("The written description is considered, in particular to determine if the patentee acted as his own lexicographer, as our law permits, and ascribed a certain meaning to those claim terms.").

In relying on the specification to interpret claim terms, the Federal Circuit has also "repeatedly warned against confining the claims" to the embodiments described in the specification. *Phillips*, 415 F.3d at 1323. The mistake of "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law." *Id.* at 1320 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed.Cir. 2001)).

■ Courts may also utilize the prosecution history which "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent .... [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317 (citations omitted). However, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

■ Lastly, courts may rely on extrinsic evidence such as dictionaries, learned treatises, and expert testimony, which may serve to provide a source of "accepted meaning of terms used in various fields of science and technology," or by

providing "background on the technology at issue." *Id.* at 1317–18. However, such "extrinsic" evidence is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Id.* at 1317 (internal citations and quotation marks omitted). The use of extrinsic evidence may not be used to contradict the meaning of the claim terms as evidenced by the intrinsic evidence. *Id.* at 1317–19; *see also Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed.Cir.2005).

**B. *Indefiniteness***

■ Patent limitations function to put the public on notice of the metes and bounds of an invention. A patent limitation must describe the invention with sufficient clarity for the public, including the patentee's competitors, to determine whether or not the patent is infringed. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28–29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Consequently, the law requires claims to "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.

■ To rule "on a claim of patent indefiniteness, a court must determine whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed.Cir.2004) (citations omitted). A claim limitation that is not amenable to construction is indefinite and invalid as a matter of law. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir.2001). Given the patent's presumption of validity, *see* 35 U.S.C. § 282, however, a court should hold a claim indefinite only after reasonable

efforts at construction prove futile. *Exxon Research*, 265 F.3d at 1375. If the claim's meaning is discernable, "even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the claim is "sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.* Thus "[o]nly claims not amendable to construction or insolubly ambiguous are indefinite" and thus invalid. *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed.Cir.2005) (quotation marks and citation omitted). A party must show invalidity for indefinites by clear and convincing evidence, and close questions of indefinites "are properly resolved in favor of the patentee." *Exxon Research*, 265 F.3d at 1380.

### C. Means Plus Function Claims

"Means plus function" limitations recite a function to be performed without reciting specific structure for performing the function. Instead, the limitation recites a "means" for performing the stated function. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed.Cir.2003). The patent statute requires that such "means" limitations "must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof" for performing the claimed function. *Id.*; 35 U.S.C. § 112, ¶ 6.

In construing a means plus function limitation, a court must identify both the claimed function and the corresponding structure disclosed in the written description that performs that function. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed.Cir.2006); *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed.Cir.2005).

When identifying the claimed function, a court may not construe the function "by adopting a function different from that explicitly recited in the claim." *JVW*, 424 F.3d at 1331 (internal quotations marks and citation omitted). "Correctly identifying the claimed function is critical, because 'an error in identification of the function can improperly alter the identification of the structure . . . corresponding to that function.'" *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1087 (Fed.Cir. 2003) (citation omitted).

Once the function is properly identified, the patent's specification must next be examined to determine the corresponding structure disclosed by the patent that performs the identified function. *See Applied Med.*, 448 F.3d at 1332. "Under this second step, 'structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed.Cir.2003) (citation omitted). "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed.Cir.2005). If no structure for performing the claimed function is disclosed, the claim is invalid for indefiniteness. *See, e.g., Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1114 (Fed.Cir.2002).

### D. Summary Judgment

Summary judgment may only be granted when there is "no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In consider-

ing a motion for summary judgment, "[t]he Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor." *Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co.,* 589 F.Supp.2d 314, 319 (S.D.N.Y.2008) (citing *Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir.2006)). "A party seeking summary judgment bears the burden of establishing that no genuine issue of material facts exists." *Id.* If the moving party has made "a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact," then the nonmoving party must present evidence that would be sufficient to support a jury verdict in the nonmoving party's favor. *See id.* (citing *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995)).

## IV. THE DISPUTED LIMITATIONS

The parties dispute the definition of the following claim terms found in all of the claims-in-suit: "telephone number;" "assigned incoming telephone number;" "recipient;" "associated with;" "wherein said caller has a plurality of assigned incoming telephone numbers to choose from;" "without input of further data by said caller;" and "whereby said caller is not required to be within a particular network for making calls." The parties also dispute the definition of the term "a local calling area of the caller," found in claims 8 and 20, and "originating telephone number assigned to the caller," found in claim 18.

The parties further dispute the definition of several "module"-based terms found in claims 15, 18, 20, and 35: "an originating telephone number module for identifying an originating telephone number of a caller;" "a telephone number detection module for detecting an assigned telephone number dialed by the caller;"

and "a call connection module for connecting the caller with a recipient based on the assigned telephone number and the originating telephone number" (collectively, the "module limitations"). Finally, the parties also dispute several terms found in claims 14 and 30 that identify the means for accomplishing various tasks: "means for detecting an identity of a caller;" "means for receiving an assigned incoming telephone number;" "means for identifying a recipient associated with the assigned incoming telephone number and the identity;" and "means for connecting the caller and the recipient (collectively, the "means limitations").

Rebtel asserts that the terms "assigned incoming telephone number," "whereby said caller is not required to be within a particular network for making calls," and "a local calling area of the caller" are indefinite and that the claims containing the terms are therefore invalid. Because these terms are found in the three independent claims-in-suit upon which all of the dependent claims-in-suit rely, Rebtel seeks summary judgment of invalidity of all of the claims-in-suit.

In addition, Rebtel asserts that the claims-in-suit containing either the module limitations or the means limitations are indefinite for failing to disclose a corresponding structure as required by 35 U.S.C. § 112, ¶ 6.

Independent claim 1 of the '156 Patent recites as an invention:

A method comprising:

detecting an identity of a caller;

receiving an assigned incoming telephone number;

identifying a recipient associated with the assigned incoming telephone number and the identity; and

connecting the caller and the recipient, wherein said caller has a plurality of

assigned incoming telephone numbers to choose from, at least one of said plurality of assigned incoming telephone numbers being associated with said recipient,

wherein each assigned incoming telephone number is associated with multiple recipient telephone numbers, a particular telephone number of a recipient being determined solely by a particular assigned incoming telephone number used by a particular identified caller and without input of further data by said caller, whereby said caller is not required to be within a particular network for making calls.

Independent claim 14 of the '156 Patent recites as an invention:

A system comprising:

means for detecting an identity of a caller;

means for receiving an assigned incoming telephone number,

means for identifying a recipient associated with the assigned incoming telephone number and the identity; and

means for connecting the caller and the recipient, wherein said caller has a plurality of assigned incoming telephone numbers to choose from, at least one of said plurality of assigned incoming telephone numbers being associated with said recipient,

wherein each assigned incoming telephone number is associated with multiple recipient telephone numbers, a particular telephone number of a recipient being determined solely by a particular identified caller and without input of further data by said caller, whereby said caller is not required to be within a particular network for making calls.

Independent claim 15 of the '156 Patent recites as an invention:

A system comprising:

an originating telephone number module for identifying an originating telephone number of a caller;

a telephone number detection module for detecting an assigned telephone number dialed by the caller; and a call connection module for connecting the caller with a recipient based on the assigned telephone number and the originating telephone number, wherein said caller has a plurality of assigned incoming telephone numbers to choose from, at least one of said plurality of assigned incoming telephone numbers being associated with said recipient, wherein each assigned incoming telephone number is associated with multiple recipient telephone numbers, a particular telephone number of a recipient being determined solely by a particular assigned incoming telephone number used by a particular identified caller and without input of further data by said caller, whereby said caller is not required to be within a particular network for making calls.

The remaining claims-in-suit are dependent on claims 1, 14, and 15: claims 2–4, 6–8, 12, 21, 22, 25 are dependent on claim 1; claim 30 is dependent on claim 14; and claims 18, 20, and 35 are dependent on claim 15. These dependent claims recite additional features of the claimed system and methods.

Dependant claim 8 recites as an invention:

The method according to claim 1 wherein the recipient is located outside of a local calling area of the caller.

Dependant claim 18 recites as an invention:

The system according to claim 16 wherein the profile information includes the originating telephone number assigned to the caller.

Dependent claim 16, which is not alleged have been infringed by Rebtel, is in turn dependent on claim 15.

Dependant claim 20 recites as an invention:

> The system according to claim 15 wherein the recipient is located outside the local calling area of the caller.

### A. "telephone number"

Stanacard proposes that the term "telephone number" be given its plain and ordinary meaning. Rebtel proposes that the term be defined as "a series of alphanumeric characters, that may vary in length, used to route telephone calls." According to Rebtel, advances in telecommunications technology as well as the various alphanumeric forms a "telephone number" may take requires the adoption of its proposed definition.

"Telephone number" is a simple and widely used term, and there is no indication that the inventors intended to use the term differently from its commonly understood meaning among persons of skill in the art. Rebtel's proposed definition serves only to introduce additional terms into the claim and would result in confusion for the jury. *See Am. Patent Dev. Corp. v. Movielink, LLC,* 604 F.Supp.2d 704, 716 (D.Del.2009) (refusing to adopt a construction which was "merely a verbose paraphrasing of claim language that otherwise offers little to assist one of skill in the art in understanding the claims"); *Parker–Hannifin,* 2008 WL 5732941, at *10, 2008 U.S. Dist. LEXIS 108152, at *38 (providing no construction for words which should be readily understood by a jury and where defendant's constructions merely offered synonyms for the claim terms); *WIMCO,* 2007 WL 4461629, at *4, 2007 U.S. Dist. LEXIS 92502, at *11 (providing no claim construction for a term where "any further

definition or paraphrasing would serve no useful purpose.").

Consequently, "telephone number" is given its plain and ordinary meaning.

### B. "assigned incoming telephone number"

■■ Stanacard proposes that the term "assigned incoming telephone number" either be given its plain and ordinary meaning or, to the extent it must be defined, be given the definition "telephone number assigned to initiate calls into a system." Rebtel argues that the term is indefinite or, to the extent it may be defined, should be given the definition "telephone number preprogrammed by a caller to correlate to a recipient."

Rebtel has argued that "assigned incoming telephone number" is indefinite because it does not specify whom or what does the assigning nor does it specify to whom or what the number is assigned. However, there is no requirement that the claim be limited in this manner, and "[w]ho or what performs claimed method steps is generally irrelevant to claim scope." *Alcatel USA Sourcing, Inc. v. Microsoft Corp.,* No. 6:06 CV 499, 2008 WL 3914889, at *9, 2008 U.S. Dist. LEXIS 64351, at *24 (E.D.Tex. Aug. 21, 2008) (finding that "while the specification discloses that a user enters the first user identification information, the disclosed embodiments do not require a user to perform that method step").

Rebtel's proposed construction seeks to introduce the phrase "preprogrammed by a caller." However, the term "preprogrammed" is not found anywhere in the specification or the prosecution history, and the only use of a variant of "preprogrammed" is in a single passage in the specification that states "[f]or example, the caller programs the system 300 to connect with a particular recipient when the caller

dials one of the assigned incoming telephone numbers." '156 Patent, col. 4:21–23. This reference provides only a single example of the claimed invention, and it would be improper to limit the claims to a preferred embodiment disclosed in the specification. *See Phillips*, 415 F.3d at 1323; *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed.Cir.2008); *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed.Cir.2003).

Rebtel's proposed construction also seeks to incorporate "correlate to a recipient" into the claim term. As the specification and the claims make clear, the existence of a correlation between a telephone number dialed by the caller and a particular recipient is at the heart of the claimed invention. *See, e.g.*, '156 Patent, col. 3:45–48; 5:32–34. Moreover, including the phrase "correlate to a recipient" serves to clarify that the "assigned incoming telephone number" is the number dialed by the caller that is associated with a recipient and not, e.g., the number assigned by the telephone company from which a caller dials.

Stanacard argues that the inclusion of the phrase "correlate to a recipient" would render the subsequent claim element "identifying a recipient associated with the assigned incoming telephone number" superfluous because both capture the concept of an association between an assigned number and a recipient. However, the phrase "correlate to a recipient" serves only to describe the nature of the incoming telephone number; it does not set forth the separate act, described in the subsequent claim element, of "identifying a recipient" to which the number is correlated.

"[A]ssigned incoming telephone number" is not "insolubly ambiguous," *Datamize*, 417 F.3d at 1347, and is therefore construed to mean "telephone number corre-

lating to a recipient assigned to initiate calls into a system."

### C. *"recipient"*

Stanacard proposes that "recipient" be given its plain and ordinary meaning. Rebtel seeks to define "recipient" as a "person, or device or address associated with the person, which the caller is attempting to connect" on the grounds that it is necessary to clarify that a recipient is not limited to a person, but may include various devices or addresses associated with a person.

Like "telephone number," recipient is a commonly used and understood term that does not require a lengthy definition that would only serve to confuse the jury. Moreover, although the parties agree that "recipient" would include not only people, but also entities and businesses, Rebtel's specific reference to a "person" or "items associated with a person" in its proposed definition would imply that certain non-person entities are excluded from the scope of the term "recipient" as used in the '156 Patent.

"Recipient" is therefore given its plain and ordinary meaning.

### D. *"associated with"*

Stanacard proposes that "associated with" be given its plain and ordinary meaning, while Rebtel argues that "associated with" be given the definition "preprogrammed by the caller to correlate to."

Rebtel argues that given the computerized context of the claimed invention, the association between the incoming telephone number and the recipient number must, in fact, be "preprogrammed." Further, Rebtel asserts that because the specification only discloses embodiments in which the caller preprograms the system, the claims are properly limited to the single disclosed embodiment. *See, e.g., Toro*

*Co. v. White Consolidated Indus., Inc.,* 199 F.3d 1295, 1301–02 (Fed.Cir.1999); *Ormco Corp. v. Align Tech., Inc.,* 498 F.3d 1307, 1316 (Fed.Cir.2007).

However, the specification, including the passages cited by Rebtel, do not establish that "associated with" has the same meaning as "preprogrammed." *See Vitronics,* 90 F.3d at 1582. Things can be "associated" with each other by an individual without being preprogrammed by the individual, as the specification of the '156 Patent makes clear. *Compare* '156 Patent, col. 4:18–23 ("In one embodiment, the call connection module 360 selects a particular recipient based on the profile information associated with the caller. For example, the caller programs the system 300 to connect with a particular recipient when the caller dials one of the assigned incoming telephone numbers.") *with* col. 7:1–5 ("In another embodiment, the recipient is determined, in part, by the recipient selected by the caller to be associated with the specific assigned incoming telephone number as shown in the recipient field 430 within the caller's profile."). Because the specification discloses embodiments in which the caller may select the recipient of a call without actually engaging in preprogramming the system to dial the selected recipient, it cannot be said that the specification discloses only a single embodiment of the invention in which the caller preprograms the system. As a result, Rebtel's proposed definition would improperly impose a new limitation to the claim term "associated with."

Finally, Rebtel's definition would introduce unnecessary verbiage to claim language that a jury would understand. *See Alcatel USA,* 2008 WL 3914889, at *10–11, 2008 U.S. Dist. LEXIS 64351, at *30–31 (holding that "associating" did not require construction because "a lay jury will understand the term").

"Associated with" is given its plain and ordinary meaning.

**E.** ***"wherein said caller has a plurality of assigned incoming telephone numbers to choose from"***

Stanacard proposes that this term be given its plain and ordinary meaning. Rebtel proposes the alternative definition "wherein the caller, when placing a call, has more than one assigned incoming telephone number available for use." Rebtel argues that its proposed definition provides a temporal boundary of the scope of the limitation insofar as it explains that, in the context of this invention, the caller has more than one assigned incoming telephone number available to dial when the caller is placing a call.

Rebtel, however, offers no argument for why the existing claim language would be confusing to a jury or otherwise requires rewording. Moreover, its proposed definition introduces further confusion insofar as it introduces the undefined temporal restriction "when placing a call." This claim term is therefore given its plain and ordinary meaning. *See Am. Patent Dev.,* 604 F.Supp.2d at 716 (rejecting plaintiff's proposed claim construction as a "paraphrasing of the claim language that otherwise offers little to assist one of skill in the art in understanding the claims.").

**F.** ***"without input of further data by the caller"***

Stanacard proposes that this claim term be given its plain and ordinary meaning. Rebtel seeks to assign the term the definition "in order to connect to the recipient, the caller is not required to enter any information other than the assigned incoming telephone number."

The parties do not appear to disagree that the term indicates that once the

claimed system possesses both the caller's identity (through the caller's telephone number) and the number being dialed (the assigned incoming telephone number), the caller is not required to enter any additional information. The existing claim language succinctly conveys this idea, and Rebtel offers no compelling reason for the adoption of its much lengthier definition. *See id.*

### G. *"whereby said caller is not required to be within a particular network for making calls"*

Stanacard argues that this term should be given its plain and ordinary meaning or, in the alternative, be construed to mean "whereby the caller is not required to use any particular type of network such as private branch exchange, landline, mobile, or Internet."

Rebtel argues that this claim language is insolubly ambiguous, and therefore invalid, on the grounds that the '156 Patent fails to define with sufficient specificity what constitutes a "network." As a result, Rebtel argues, a party cannot know whether or not it is "within a particular network for making calls."

The point of this claim limitation, however, is not to require that a caller be situated within a particular type of network. Rather, it states the opposite—that what is claimed is an open system that does not restrict the caller to any specific network when calling into the claimed system. *See* '156 Patent, col. 1:29–31 ("In addition, a calling card caller is typically able to utilize any telephone within a general geographic area to complete the telephone call ...."). This is consistent with Stanacard's arguments before the patent examiner, in which it distinguished the claimed invention over the Bedingfield reference by noting that the claimed invention did not require that the caller be within a particular

network for making calls. *See* '156 Patent File History, Comments on Stmt. of Reasons for Allowance, Jan. 11, 2008, at 1. Moreover, the specification makes clear that this claim limitation refers to events occurring prior to the caller's connection with the claimed system and does not encompass the utilization of either Stanacard or Rebtel's "networks." *See, e.g.,* '156 Patent, col. 2:22–26 ("The environment includes an electronic device 111 (e.g. a land line telephone, a cellular telephone, a satellite telephone, and the like), a caller interface 115, a network 120 (e.g., a local area network, a home network, the Internet, telephone network) ...."); Fig. 1.

The claim language, read in the context of the specification's disclosure, establishes that this limitation excludes from claimed material any system that restricts the caller to a specific network, of any type, when dialing the assigned incoming telephone number and placing a call into the claimed system. Because the claim language conveys the meaning of this limitation, no construction is required and "whereby said caller is not required to be within a particular network for making calls" is given its plain and ordinary meaning.

### H. *"a local calling area of the caller"*

Stanacard argues that this term should be given its plain and ordinary meaning or, in the alternative, be defined as "a calling area where a caller does not incur long distance or toll charges when making a call." Rebtel asserts that this claim term is insolubly ambiguous and therefore indefinite.

The specification explains that the "local calling area of the caller" is one in which "the caller does not incur long distance or toll charges." '156 Patent, col. 7:50–51. Thus, the "local calling area of the caller" is tied to whether additional charges are incurred by the caller in dialing into the

claimed system. This is consistent with the goal of the claimed invention to capture one of the benefits of calling cards—namely, placing calls without incurring toll charges. *See* '156 Patent, col. 1:29–32.

Rebtel notes that depending on a caller's calling plan, the local calling area may include the entire nation, or even the entire world. While those circumstances may render Stanacard's claimed invention useless insofar as it may not provide any monetary or convenience benefits, it does not render the disputed claim term meaningless or indefinite.

For the foregoing reasons, the term "a local calling area of the caller" is defined as "a calling area where a caller does not incur long distance or toll charges when making a call."

### I. *"originating telephone number assigned to the caller"*

■■■ Stanacard argues that the term should be given its plain and ordinary meaning or, in the alternative, be construed to mean "telephone number given to a caller from which the caller initiates a call." Rebtel seeks to define this term to mean "telephone number preprogrammed by the caller to correlate to the caller."

By the words of the claim term itself, the originating telephone number is one assigned "to the caller," meaning that it is a number assigned by someone else to the caller. The specification also explains that the "originating telephone number" is the phone number from which the caller initiated or placed the call. *See* '156 Patent, col. 3:54–56, 5:22–24, 6:43–48. The originating telephone number is thus the caller's own telephone number which was provided by the caller's telephone company. This is properly reflected in Stanacard's proposed alternate definition, "telephone number given to a caller from which the caller initiates a call."

Rebtel's definition attempts to introduce the requirement that the originating number is one that must be "preprogrammed by the caller" to be associated with his or her account in the system. As discussed *supra* in Sections IV.B & D, the introduction of the "preprogrammed" language into the claim definition would improperly limit the scope of the claim. Nor does the lack of disclosure of how, when, and by whom the number is assigned require the adoption of Rebtel's proposed definition.

The claim limitation "originating telephone number assigned to the caller" is therefore defined to mean "telephone number given to a caller from which the caller initiates a call."

### J. *The Module Limitations*

■■■ The parties dispute whether the module limitations found in claims 15, 18, 20, and 35 of the '156 Patent should be treated as "means plus function" limitations subject to 35 U.S.C. § 112, ¶ 6. A claim limitation that does not use the word "means" triggers a rebuttable presumption that § 112, ¶ 6 does not apply. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed.Cir.2002) (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed.Cir. 1998)). This presumption may be rebutted by demonstrating that the disputed claim term fails to "recite sufficiently definite structure" or else recites "function without sufficient structure for performing that function." *See id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed.Cir. 2000)). "What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of the structure and is simply a substitute for the term 'means for.'" *Lighting World, Inc.*

*v. Birchwood Lighting, Inc.,* 382 F.3d 1354, 1360 (Fed.Cir.2004). However, the Federal Circuit has also observed:

> In considering whether a claim term recites sufficient structure to avoid application of § 112, ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.

*Id.* at 1359–60 (citing *Greenberg v. Ethicon Endo–Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed.Cir.1996)).

Numerous cases demonstrate that the term "module," in the context of the telecommunications field, denotes sufficient structure such that § 112, ¶ 6 is not invoked. *See, e.g., PalmTop Prods., Inc. v. Lo–Q PLC,* 450 F.Supp.2d 1344, 1364–65 (N.D.Ga.2006) (holding that " '[c]ommunications module,' and even 'module,' represents more than a mere verbal construct serving as a 'means for' substitute" and concluding " 'module' connotes definite structure, and when combined with 'communications,' which describes the module's operation, sufficient structural meaning will likely be conveyed to a person of ordinary skill in the art"). Similarly, the court in *C2 Commc'ns Techs., Inc. v. AT & T, Inc.* also found, in the context of a telephone calling system patent, that section § 112, ¶ 6 is not "invoked by the use of the term 'module.' " No. 2:06–CV–241, 2008 WL 2462951, at *11, 2008 U.S. Dist. LEXIS 46942, at *34–35 (E.D. Tex. June 13, 2008) (holding that "first protocol conversion module" does not invoke § 112, ¶ 6).

Moreover, in many communications and computer arts cases, courts have found that a "module" is the actual structure described in the specification which corresponds to the function claimed by means language. *See On Demand Mach. Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331, 1340–41 (Fed.Cir.2006) (affirming claim construction that found "computer module" to be the structure for "means for a customer to visually review said sales information"); *Foundry Networks v. Lucent Techs., Inc.,* No. 2–04–CV–40, 2005 WL 6217420, at *7, 8, 9, 2005 U.S. Dist. LEXIS 46840, at *21, 22, 24, 25 (E.D.Tex. May 24, 2005) (finding "voice communication module" to be the structure for "means for forwarding an incoming call" limitations); *Roche Diagnostics Corp. v. Apex Biotechnology Corp.,* 455 F.Supp.2d 840, 868 (S.D.Ind.2005) (finding "a removable and/or reinsertable read-only-memory ("ROM") chip and/or module" to be the structure for "pluggable memory key means" limitation); *Alcatel USA,* 2008 WL 3914889, at *18, 20, 21, 2008 U.S. Dist. LEXIS 64351, at *52, 56, 60 (finding a processor using a "locator module" to be structure for "means for determining" and "means for identifying" and "device module" and the software executing it to be structure for "means for manipulating each received data or message"); *Visto Corp. v. Good Tech, Inc.,* No. 2:06–CV–039, 2008 WL 163576, at *11–12, 13, 2008 U.S. Dist. LEXIS 3244, at *32–34, 37 (E.D.Tex. Jan. 16, 2008) (finding "general synchronization module" to be the structure for "first[/second] means for generating first[/second] examination results from first[/second] version information" and "means for generating;" "synchronization start module" to be the structure for "means for initiating;" and communications module" to be the structure for "means for downloading data"), *constructions adopted by Visto Corp. v. Research in Motion, Ltd.,* 623 F.Supp.2d 756 (E.D.Tex.2008); *Autobytel, Inc. v. Dealix Corp.,* No. 2:04–CV–338, 2006 WL 155683, at *8–9, 2006

U.S. Dist. LEXIS 3381, at *24–26 (E.D.Tex. Jan. 18, 2006) (finding "process purchase request module," "database access module," "buyer-dealer association module," and "network access module" to be structures for "means for identifying," "means for creating," and "means for communicating").

 The terms "originating telephone number module," "telephone number detection module," and "call connection module" would be readily understood by a person of skill in the art based on the functions to be performed. For example, with respect to the "originating telephone number module," the specification states that "[i]n one embodiment, the caller's telephone number is detected by the call identification module 320 through caller ID service. In this embodiment, the caller identification module 320 automatically senses the caller's telephone number though the caller ID service" and "[i]n one embodiment, the caller's telephone number is automatically detected through a caller identification service that supplies the telephone number from which the telephone call is placed." '156 Patent, col. 3:45–61, 6:45–48; Fig. 3. The specification also provides that "[t]he telephone number detection module 310 detects the telephone number dialed by the caller. In one embodiment, the telephone number dialed by the caller is an assigned incoming telephone number that corresponds with a recipient." '156 Patent, col. 3:44–48; Fig. 3. The specification also discloses that "the call connection module 360 connects the caller with a particular recipient based on the identity of the caller, the caller's profile, and the assigned incoming telephone number dialed by the caller." '156 Patent, col 4:33–36. Thus, "originating telephone number module," "telephone number detection module," and "call connection module" would be understood by a person

skilled in the art to refer to any of that class of hardware and/or software components that, respectively, (1) identifies an originating telephone number; (2) detects a dialed telephone number; and (3) connects a telephone call. As a result, § 112, ¶ 6 is not invoked.

In asserting that the module limitations should be treated as means plus function limitations subject to § 112, ¶ 6, Rebtel cites to the Federal Circuit's holding in *Ranpak Corp. v. Storopack, Inc.*, No. 98–1009, 1998 WL 513598 (Fed.Cir. July 15, 1998). There, the patents-in-suit were directed towards technology for converting multi-ply paper into pad-like products to be used as cushioning in boxes. The patents contained claims reciting both a "settable control means" as well as a "settable control module." The court concluded that "settable control module" invoked § 112, ¶ 6. Rebtel has also cited to *Kozam v. Phase Forward, Inc.*, No. MJG–04–1787, 2005 WL 6218037, at *6–7 (D.Md. Aug. 29, 2005), in which the court concluded that the terms "first data verification module" and "second data verification module" should be construed the same as "first data verification means" and "second data verification means."

Both cases, however, are distinguishable on their facts. In *Ranpak*, there was no indication that the term "module" identified a structure as understood by a person of skill in the art. Consequently, the "module" containing claims simply recited the same function described in the "means" containing claims without offering any additional structural description. 2005 WL 6218037, at *6–7 ("[T]he use of the term 'settable control module' invokes [§ 112, ¶ 6], because it merely sets forth the same black box without recitation of structure for providing the same specified function."). In *Kozam*, the court found that the term "module" referred to a software

component of a much larger software program, but failed to describe any meaningful structure. *Kozam*, 2005 WL 6218037, at *6. Because "module" failed to convey any structural meaning beyond the recitation of its function, the court concluded that the limitations containing "module" should be treated as means plus function limitations subject to § 112, ¶ 6. *Id.* at *6–7.

In contrast, numerous cases have demonstrated that in the telecommunications context, there exists a well-understood structure associated with the term "module" by those skilled in the art.[1] *See, e.g., C2 Commc'ns Techs.*, 2008 WL 2462951, at *11, 2008 U.S. Dist. LEXIS 46942, at *34–35; *Foundry Networks*, 2005 WL 6217420, at *7, 8, 9, 2005 U.S. Dist. LEXIS 46840, at *21, 22, 24, 25; *Alcatel USA*, 2008 WL 3914889, at *18, 20, 21, 2008 U.S. Dist. LEXIS 64351, at *52, 56, 60. As a result, neither *Ranpak* nor *Kozam* requires the application of § 112, ¶ 6 to the module limitations of the '156 Patent.

Consequently, the presumption against subjecting claims lacking the "means" language to the requirements of § 112, ¶ 6 applies, and the module limitations of the '156 Patent should not be treated as means plus function limitations. *See CCS Fitness*, 288 F.3d at 1369.

### K. *The Means Limitations*

█ In asserting that the means limitations of the '156 Patent are indefinite for failing to disclose a structure as required by § 112, ¶ 6, Rebtel relies on *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339 (Fed.Cir.1999) and the related line of Federal Circuit precedent. *See Net MoneyIN v. VeriSign, Inc.*, 545 F.3d 1359 (Fed.Cir.2008); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir.2008); *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328 (Fed.Cir.2008); *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed.Cir.2005).

In *WMS Gaming*, the patent at issue covered an electronic slot machine designed to manipulate the odds of winning by using a mathematical formula, rather than the natural stop positions of the slot machine reels, to control the outcome of the game. The means limitation for assigning numbers to the stop positions on the reel disclosed, as the corresponding structure, a microprocessor or computer to control the slot machine along with an algorithm for assigning numbers to the various stop positions. *WMS Gaming*, 184 F.3d at 1347–48. The Federal Circuit held that the corresponding structure was the algorithm to be run on the general purpose microprocessor since the computer, once programmed with the algorithm, "in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software." *Id.* at 1348 (quoting *In re Alappat*, 33 F.3d 1526, 1545 (Fed. Cir.1994) (en banc)).

Rebtel's indefiniteness argument with respect to the means limitations of the '156 Patent is premised on its assertion that the *WMS Gaming* line of cases applies to these limitations. *WMS Gaming*, however, dealt with the situation in which the disclosed structure for a means plus function claim was a general purposes comput-

---

**1.** Rebtel also argues that the court in *Alcatel USA Res. Inc. v. Microsoft Corp.*, No. 6:06 CV 500, 2008 WL 2625852, 2008 U.S. Dist. LEXIS 49615 (E.D. Tex. June 27, 2008) found the term "module" to be indefinite. However, the term at issue was "recognition means," which the court identified as being located within a "set-up module." *Id.* at *13, 2008 U.S. Dist. LEXIS 49615 at *38. The court did not find that the "set-up module" term was subject to § 112, ¶ 6 or that it was indefinite.

er or microprocessor programmed to carry out a mathematical algorithm. *See id.* at 1349. Subsequent cases applying *WMS Gaming* to require disclosure of an "algorithm" share the common characteristic of dealing with systems in which algorithms were used to perform various functions on a general purpose computer or microprocessor. *See Net MoneyIN*, 545 F.3d at 1365 (system for processing credit card transactions over the Internet and to address security issues utilizing computer "means for generating an authorization indicia in response to queries"); *Finisar*, 523 F.3d at 1340 (information broadcasting system with computer-based "database editing means . . . for generating a hierarchically arranged set of indices . . . and for embedding said indices."); *Aristocrat Techs.*, 521 F.3d at 1331–33 (electronic slot machine with "game controls means" "defining a set of predetermined arrangements for a current came" where the structure was simply "any standard microprocessor base [sic] gaming machine [with] appropriate programming."); *Harris Corp.*, 417 F.3d at 1253–54 (system implemented by a microprocessor programmed to handle distortion of wireless signals using a "time domain processing means for simulating the time domain effect of said dispersive medium on signals . . . and for producing estimates of said information signals").

Those cases establish that disclosing a computer or a computer with "appropriate programming" as the structure designated to perform a function does not satisfy the requirements of § 112, ¶ 6. The specifications of the patents at issue in those cases identified only general purpose computers or microprocessors as the relevant structure without providing specifics as to the type of software running on the devices. Because general purpose computers and microprocessors can be programmed to perform any number of functions, a person

skilled in the art reading the claims in view of the specification would not understand the metes and bounds of the claims. *WMS Gaming* and the cases citing to it sought to prevent this type of indefinite claiming that relied on the disclosure of an undefined computer algorithm.

Here, however, the specification of the '156 Patent does not point to some undefined software implemented on a general purpose computer as the corresponding structure for its functional claim limitations. Rather, the specification describes various types of modules and their equivalents as the corresponding structure for the means limitations. Numerous courts have previously found that in the telecommunications field, a "module" is not a general purpose computer. Rather, it is a special purpose hardware device or software component, readily identifiable to a person of skill in the art, and which can serve as the corresponding structure for a means plus function limitation. *See Foundry Networks*, 2005 WL 6217420, at *7, 8, 9, 2005 U.S. Dist. LEXIS 46840, at *21, 22, 24, 25 ("voice communication module"); *Alcatel USA*, 2008 WL 3914889, at *18, 20, 21, 2008 U.S. Dist. LEXIS 64351, at *52, 56, 60 ("locator module" and "device module"); *Roche Diagnostics*, 455 F.Supp.2d at 857 ("removable and/or read-only-memory . . . module"); *Visto Corp.*, 2008 WL 163576, at *11–12, 13, 2008 U.S. Dist. LEXIS 3244, at *32–34, 37 ("general synchronization module," "synchronization start module," and "communications module"); *Autobytel*, 2006 WL 155683, at *8–9, 2006 U.S. Dist. LEXIS 3381, at *24–26 ("process purchase request module," "database access module," buyer-dealer association module," and "network access module").

Moreover, not every patent that utilizes computer processing power must disclose all the algorithms utilized. Courts have

502

held that a specific algorithm need not be disclosed to avoid indefiniteness where the function in question would be readily apparent to a person of skill in the art. *See Aristocrat Techs. Austl. Pty Ltd. v. Multimedia Games, Inc.,* 266 Fed.Appx. 942, 947 (Fed.Cir.2008) ("*WMS Gaming,* however does not require that a particular algorithm be identified if the selection of the algorithm or group of algorithms needed to perform the function in question would be readily apparent to a person of skill in the art."); *Med. Instrumentation,* 344 F.3d at 1214 ("[T]here would be no need for a disclosure of the specific program code if software were linked to the converting function and one skilled in the art would know the kind of program to use."); *S3 Inc. v. nVIDIA Corp.,* 259 F.3d 1364, 1371 (Fed.Cir.2001) ("[T]he law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention."); *SPX Corp. v. Bartec USA, LLC,* 557 F.Supp.2d 810, 819–20 (E.D.Mich.2008) (extent of algorithm requirement determined by knowledge of ordinary skilled artisan).

Here, a caller ID detection module (or originating telephone number module) performs the well-known function of identifying the calling telephone number. Likewise, a telephone number detection module performs the function of detecting the dialed telephone number, an interface module performs the function of receiving an incoming telephone call, and a call connection module performs the function of connecting telephone calls. These functions practiced by every telephone service provider and are well known in the art.

The '156 Patent's module references would convey to a person skilled in the art the structure required for performing the claimed functions and therefore the metes and bounds of the claim. As a result, the *WMS Gaming* line of cases is inapplicable, and the means limitations of the '156 Patent are not indefinite.

## V. CONCLUSION

For the foregoing reasons, Rebtel's motion for summary judgment is denied, and the disputed claim terms are given the definitions set forth in this opinion.

It is so ordered.